FIRST UNION REAL ESTATE
EQUITY AND MORTGAGE
INVESTMENTS, Plaintiff,

v.

CROWN AMERICAN CORPORATION,
Wyoming Valley Mall, Inc., and
Middletown Mall, Inc., Defendants.

Civ. No. 83–1053.

United States District Court,
M.D. Pennsylvania.

March 31, 1986.

Clyde McIntyre, Harrisburg, Pa., for plaintiff.

Philip M. Hammett, Diana S. Donaldson, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

CONABOY, District Judge.

### I. Background

This is an action on a contract brought by Plaintiff First Union Real Estate Equity and Mortgage Investments (hereinafter First Union) against Defendants Crown American Corporation; Wyoming Valley Mall, Incorporated; and Middletown Mall, Incorporated (hereinafter Crown, WVM, and MM respectively). First Union owns a 50% interest in both the Wyoming Valley Mall and the Middletown Mall—shopping centers which were constructed by Crown. Crown has retained a 50% interest in both malls. The contractual relationship between First Union and Crown came into being when the former advanced funds to the latter to enable the latter to complete construction of these projects.

The contract (actually a series of lease agreements rather than a single, integrated document) between and among these parties contemplated that WVM and MM— wholly owned subsidiaries of Crown which were created to collect the revenues these malls would generate and to distribute said revenues to First Union and Crown—would pay First Union a stated guaranteed rent

and 25% of the "gross rents" over a specified breakpoint. The deal was structured in that fashion because First Union wanted to make certain that its status as a real estate investment trust would not be jeopardized in any way. This might have been the case under the Internal Revenue Code if First Union were perceived as being actively engaged in the management of real estate.

First Union seeks payment of its share of common area charges (CAM's), Sunday and holiday charges, lease termination payments, proceeds from restrooms and telephone booths, etc. to which it claims it is entitled because a clause of its contract with Crown—paragraph 3.02(b)—mandates that such charges should be incorporated into the category of "gross rents". Crown argues that such charges were not contemplated to be sums to which First Union has any claim at the time the contract was being negotiated. Crown also asserts a counterclaim against First Union for money it has expended to replace a roof at the Wyoming Valley Mall and to upgrade and expand the sewage treatment plant at Middletown Mall.

On February 21, 1985, we denied a motion for summary judgment brought by First Union. Although it seemed apparent that Crown was withholding monies from First Union in derogation of their contract, we rejected an inclination to grant summary judgment in First Union's favor in deference to Crown's argument that live testimony would show that a crucial section of their contract, the aforementioned paragraph 3.02(b), should not be given the expansive interpretation urged by First Union. Thereafter, by consent of the parties, we proceeded to a non jury trial pursuant to Rule 39(b) of the Federal Rules of Civil Procedure which was held August 6 and 7, 1985. Following the trial, counsel submitted appropriate briefs and requests for findings of fact and conclusions of law. For trial purposes, counsel narrowed the issues very thoroughly and the matters tried to the Court generally went to the dispute surrounding the interpretation of

**840**

the terminology in the contracts (lease agreements) particularly as it relates to rents and items known or described as gross rents, and to the validity of the Defendants' counterclaim.

We then had the opportunity to listen to the testimony of some of the attorneys who had participated in the negotiations leading up to the agreements which delineate the rights and obligations of the parties. Afterward, we instructed the parties to submit proposed findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. On the twin bases of our judgment as to the relative credibility of the witnesses whose testimony we heard and our review of this case file, we now conclude that the preponderance of the evidence presented dictates a Verdict in favor of Plaintiff First Union.

## II. Findings of Fact

1. First Union is, indeed, a real estate investment trust (A REIT) as defined in Section 856 of the Internal Revenue Code.

2. Crown sold First Union an undivided 50% interest in the Middletown Mall in 1970 and an undivided 50% interest in the Wyoming Valley Mall in 1972.

3. By agreement of the parties, Crown formed two subsidiaries, WVM and MM, to which First Union and Crown leased their separate interests in these shopping centers.

4. By agreement of the parties, Crown was designated to act as the managing agent for both malls since, as a REIT, First Union would lose tax advantages if actively involved in managing real estate.

5. By virtue of the lease agreements among these parties, First Union was entitled to receive a "fixed rental" as well as additional rent of 25% of any amount above a specified "breakpoint".

6. The 25% of amounts collected above the "breakpoint" was to be calculated from the total of "gross rents" actually collected.

7. Section 3.02(b) of the pertinent lease agreements states:

   As used herein, the term "Gross Rents" shall mean the rentals and all other amounts actually received in any lease year by tenant from sublessees of all or any portion of the Premises, but excluding payments by any sublessee to Tenant with respect to escalation charges for real estate or other taxes and any other charges which, as to Landlord, would not qualify as "rents from real property" for purposes of Section 856 of the Internal Revenue Code, or any amendments thereto. Tenant agrees that if any separate charges for Tenant's services are made in its leases with sublessees of the Property, such charges shall not exceed the reasonable value of the services. In the event of any dispute as to whether or not any rentals do or do not qualify as "rents from real property" under Section 856 of the Internal Revenue Code, the determination by counsel for the Landlord shall be determinative and binding on Landlord and Tenant. As used herein, the term "Lease Year" shall mean the 12 month period commencing on the first day of the month subsequent to the month in which this Agreement is executed and delivered, and each subsequent 12 month period during the term of the lease.

8. Section 3.02(b), as well as the entirety of all agreements and leases consummated between these parties, was arrived at after lengthy and deliberate negotiations conducted by skilled lawyers for both parties.

9. Each side had the opportunity and, in fact, did review all of the elements of the various leases and agreements and these leases and agreements describe and define a deliberate meeting of the minds.

10. At the time these agreements were entered into, First Union was concerned over a proper return on investment and was also concerned that the amounts it would receive as rents

would in no way violate the laws which govern the types of income which REIT's are allowed to receive without exposure to normal taxation.

11. During the lease years ending June 30, 1979 through June 30, 1985, WVM received certain amounts from tenants which it did not include in the gross rents it reported to First Union and WVM did not pay any proportion of this income to First Union.

12. The amounts received and not reported as gross rents by WVM and the purposes for which they were received are as follows:

| A. | Sunday and holiday charges | $304,450.00 |
|---|---|---|
| B. | Increase in insurance premiums | $ 26,542.98 |
| C. | Standby water service | $ 38,193.52 |
| D. | Lease terminations | $ 35,000.00 |
| E. | Kiosks (temporary tenants) | $261,280.18 |
| F. | Restroom locks | $ 18,520.88 |
| G. | Copy machines | $ 10,329.50 |
| H. | Telephone commissions | $ 23,900.34 |

The total amount of the foregoing items is $718,217.40 and, with the accounting adjustments to which the parties agree, the total amount upon which First Union's share would properly be calculated is $690,331.87.

13. First Union's share of these revenues by virtue of the formula agreed to in the contract is $172,582.97.

14. WVM also received revenues from lessees in the lease years ending June 30, 1984 and June 30, 1985 and did not report any amount at all to First Union as gross rents. Based on the same formula used in the previous lease years, the amount of money to which First Union would be entitled is $526,-095.80.

15. From the formation of the lease through the lease year ending December 31, 1984, MM received certain amounts from tenants which it did not include in the gross rents it reported to First Union and MM did not pay any proportion of this income to First Union.

16. The amounts received and not reported as gross rents by MM and the purposes for which they were received are as follows:

| A. | Sewage charges | $ 97,557,89 |
|---|---|---|
| B. | Increase in insurance premiums | $ 8,529.18 |
| C. | Standby water service | $ 7,653.40 |
| D. | Kiosks (temporary tenants) | $ 72,556.64 |
| E. | Restroom locks | $ 9,401.97 |
| F. | Utility escalations | $ 12,342.76 |
| G. | Telephone commissions | $ 11,912.75 |

The total amount of the foregoing items is $219,954.59 and, with the accounting adjustments to which the parties agree, the total amount upon which First Union's share would properly be calculated is $225,589.03.

17. First Union's share of these revenues by virtue of the formula agreed to in the contract is $56,397.27.

18. MM also received revenue from lessees in the lease years ending December 31, 1983 and December 31, 1984 and did not report any amount at all to First Union as gross rents. Based on the same formula used in the previous lease years, the amount of money to which First Union would be entitled is $374,841.22.

19. The interpretation of "gross rents" advanced by First Union—an interpretation which would incorporate all the charges in paragraphs 12 and 16—is consistent with the wording of section 3.02(b) of the contract between these parties.

20. The cumulative effect of the testimony we heard on August 6 and 7, 1985 convinces this Court that section 3.02(b) should be accorded its plain meaning and that WVM and MM have improperly excluded the items listed in

paragraphs 12 and 16 from the calculation of gross rents.

21. Similarly, the refusal of WVM and MM to distribute any revenue to First Union in the time periods described in paragraphs 14 and 18 was improper. We find that this withholding on the bases of set-off or recoupment was clearly invalid as section 10.01 of the leases provides:

*Tenant shall, at Tenant's expense, take good care of the Premises and all sidewalks, grounds, areas, vaults, chutes, sidewalk hoists, railings, gutters, water and sewer connections, alleys and curbs in front of or adjacent to the Premises and will keep and maintain the same in good and safe order and condition, and make, or cause to be made, all repairs therein and thereon, interior and exterior, structural and non-structural, ordinary and extraordinary, foreseen and unforeseen, necessary to keep the same in good and safe order and condition howsoever the necessity or desirability therefor may occur, and whether or not necessitated by wear, tear, obsolescence or defects, latent or otherwise.* Tenant shall not commit or suffer, and shall use all reasonable precaution to prevent waste, damage, or injury to all of the same. *As used herein, the term "repairs" shall include all necessary replacements, renewals, alterations and additions, and Tenant agrees to keep the Building adequately furnished and equipped throughout the term hereof* with all equipment, fixture and articles of personal property necessary for the operation of the Premises for the purposes herein permitted. (Emphasis ours)

The above language simply cannot be interpreted to require First Union to contribute to the cost of repairing the roof at the Wyoming Valley Mall or of expanding the sewage treatment plant at the Middletown Mall.

## III. Legal Discussion

We note initially that both Crown and First Union were represented throughout the negotiations process which culminated in the signing of these leases by experienced, sophisticated counsel from large law firms. There is no evidence whatever to indicate that there was any significant disparity of bargaining power among the contracting parties. To the contrary, the testimony showed that, during the negotiations, the lawyers were in constant touch with each other, reviewed drafts of the agreements, and even reviewed separate items in the agreements so that each side was not only fully knowledgeable as to what the agreements provided, but also that each side was in full agreement with the exact wording therein.

Generally speaking, where contracting parties are represented by competent counsel, it is axiomatic that the provisions of contracts so formed will be interpreted according to the plain meaning of the language the parties have chosen. Courts, in the absence of allegations of fraud, accident, or mistake will interpret and enforce contracts as written. See *Borough of Ambridge Water Authority v. Columbia*, 458 Pa. 546, 328 A.2d 498 (1974). In the same vein, rights and obligations which the words of a contract clearly express must be recognized and enforced. See *CBS, Inc. v. Capital Cities Communications, Inc.*, 301 Pa.Super. 557, 448 A.2d 48 (1982).

### A.

As we stated earlier, upon reading the contractual clauses germane to this dispute we were very close to finding that there was no material ambiguity therein. Cognizant, however, of the time-honored principle that summary judgment is to be awarded only in the clearest of cases, we developed a concern that there might be a latent ambiguity—one stemming from the question whether the gross rent paragraph (3.02[b]) empowers Plaintiff to determine which rentals are applicable to the gross rent figure, but not to determine what income may be regarded as rentals—in the pivotal section 3.02(b). See *Easton v.*

*Washington County Insurance Co.,* 391 Pa. 28, 137 A.2d 332 (1957). Thus, we took testimony to determine the parameters of Plaintiff's authority to calculate the figure upon which its percentage would be figured.

Section 3.02(b) states, in pertinent part: " ... the term 'gross rents' shall mean the *rentals and all other amounts actually received* in any lease year by tenant from sublessees of all or any portion of the Premises...." (Emphasis ours). It is hard to imagine a more inclusive description of gross rents. The plain meaning of this language is that any proceeds received by Defendants for use of whatever kind of any portion of these malls is to be characterized as gross rents. That this plain meaning actually reflects the intent of the contracting parties is rendered all the more plausible by the testimony of Joseph Hungate, counsel for First Union in the early '70's when these agreements were negotiated. Mr. Hungate's testimony was persuasive on the whole and, in particular, with regard to the reason why the phrase "all other amounts" was inserted into the contract. Hungate testified that "all other amounts" was language he purposefully included " ... to make certain that the concept of rentals or the potential gross rent would be as large as possible". See Trial Transcript Volume I, page 54.

█ The Defendants' characterize First Union's demand for a share of the various "charges" which they have excluded from their calculation of gross rents as overreaching. See Defendants' "Brief in Opposition to Plaintiff's Proposed Findings of Fact and Conclusions of Law" at page 2. In the view of this Court, however, it strains credibility to believe that, in consideration of the portion of section 3.02(b) quoted in the preceding paragraph, these parties intended that Crown, WVM, and MM would have the right to arbitrarily categorize the revenues they received from the sublessees as either rent or various other types of surcharges upon which First

Union could not levy. As we have stated, the plain meaning of section 3.02(b) was to maximize the amount First Union could derive from all proceeds these malls would produce. If anything, Hungate's testimony rang truer than the testimony presented by Crown. However, even if we were equally impressed with the credibility of the witnesses presented by the parties, the result would then be that the plain meaning of the language would control our decision. The rationale for relying on plain meaning is well expressed in *Stewart v. McChesney,* 498 Pa. 45, 52, 444 A.2d 659 (1982), wherein the Pennsylvania Supreme Court stated:

 ... resort to the plain meaning of language hinders parties dissatisfied with their agreement from creating a myth as to the true meaning of the agreement through subsequently exposed extrinsic evidence. Absent the plain meaning rule, nary an agreement could be conceived, which, in the event of a party's later disappointment with his stated bargain, would not be at risk to having its true meaning obfuscated under the guise of examining extrinsic evidence of intent. Even if the dissatisfied party in good faith believed that the agreement, as manifest, did not express the *consensus ad idem,* his *post hoc* judgment would be inclined to be colored by belief as to what should have been, rather than strictly what was, intended.

We now reiterate our conviction that the plain meaning of section 3.02(b)—notwithstanding what we find to be the superior credibility of Hungate's testimony—compels the conclusion that all the income sources listed in paragraphs 12 and 16 of Part II of this Memorandum are properly included within the concept of gross rents.

█ Defendants argue that the portion of section 3.02(b) which gives First Union the power to unilaterally determine whether rentals [1] are "rents from real property under Section 856 of the Internal Revenue Code" was meant to function "as a shield rather than a sword". See "Defendants'

---

1. Significantly, in their own records, Defendants refer to several of the items they wish this Court to characterize as non-rental income as "rents".

Brief in Opposition To Plaintiff's Proposed Findings of Fact and Conclusions of Law" at page 2. Defendants' argue that the only reason First Union insisted on this language was to give it a modicum of control over what types of proceeds would be distributed to it in order to avoid unfavorable tax consequences. While we have no doubt that this prophylactic effect was one of the reasons why First Union insisted on this language, when the language is read in conjunction, as it must be, with the rest of the paragraph, we find that the only logical interpretation is that it was meant also to bolster the right of First Union to claim the broadest array of income which would be termed "rents from real property" that the Internal Revenue Code and the Revenue Rulings which construe it would permit. In other words, the language was simultaneously defensive and voracious. We see nothing inconsistent in this and note that the dual purpose of a REIT is to create the maximum amount of appreciation possible for the investors who become involved therein and to insure that said appreciation will be afforded favorable tax treatment.

### B.

■ We are singularly unimpressed with Defendants' argument that certain proceeds (e.g. those from pay toilets, copying machines, and telephone commissions) may not be apportioned to First Union because they are not derived from sublessees. This is an exercise in semantics. Whether the parties who operate the enterprises referred to above have leases or licenses is really irrelevant to the question whether First Union has a right to a portion of these proceeds. Section 3.02(b) explicitly provides that the only funds received by Defendants in conjunction with operation of these malls which would not be included in gross rents would be "... payments by any sublessee to Tenant with respect to escalation charges for real estate or other taxes and any other charges which, as to Landlord, would not qualify as 'rents from

real property' for purposes of Section 856 of the Internal Revenue Code, or any amendments thereto...." The only pertinent inquiry, then, is whether income from pay toilets, pay copy machines, telephone commissions, and temporary tenants constitutes "rents from real property". 26 C.F.R. § 1,856–4(a) states that "... the term 'rents from real property' means, generally, the gross amounts received for the use of, or the right to use, real property of the real estate investment trust." It is eminently clear that these amounts received from proprietors of pay toilets and pay copy machines etc. are, under the tax regulations, "rents from real property" and, thus, to be shared by Defendants with First Union according to the formula set out in their contract.

### C.

■ Defendants also argue that First Union's attempt to determine the amount attributable to gross rents is tantamount to First Union assuming the status of *de facto* manager of the malls.[2] This argument is unabridged nonsense. 26 C.F.R. § 1.856–4(b)(5)(ii) specifically provides:

> The trustees or directors of the real estate investment trust are not required to delegate or contract out their fiduciary duty to manage the trust itself, as distinguished from rendering or furnishing services to the tenants of its property or managing or operating the property. *Thus, the trustees or directors may do all those things necessary, in their fiduciary capacities, to manage and conduct the affairs of the trust itself. For example, the trustees or directors may establish rental terms, choose tenants, enter into and renew leases, and deal with taxes, interest and insurance, relating to the trust's property.* (Emphasis ours).

The plain meaning of this regulation confers legitimacy on First Union's effort to

---

**2.** This status would render the income from the shopping centers disqualified under I.R.C. § 856

for the years at issue.

exercise its unilateral right under 3.02(b) to determine what income should be characterized as gross rents. The language of the regulation permits no other interpretation but that First Union was doing something which REIT's are authorized to do without incurring any penalty.

### D.

■ Defendant have alleged counterclaims to force First Union to pay 50% of the cost Defendants incurred replacing the roof at the Wyoming Valley Mall and expanding the sewage treatment facilities at the Middletown Mall. They base this counterclaim on several venerable Pennsylvania cases which held that a co-owner is liable for half of the costs of repairs necessary to preserve the property held in common. See Defendants' Trial Brief at page 23. While we do not doubt the continued validity of this principle, its applicability to the instant case is negligible. The parties had done some self-ordering as to who would bear the risk of essential repairs. This self-ordering, manifested in Section 10 of the leases First Union executed with WVM and MM, makes it clear that the common law responsibility of First Union to contribute to the cost of essential repairs was negated by the allocation of risk the parties accepted in the leases. Section 10 provides, *inter alia,* that WVM and MM must

> ... make or cause to be made, all repairs therein or thereon, interior and exterior, structural and non-structural, ordinary and extraordinary, foreseen and unforeseen, necessary to keep the same (premises) in good and safe order and condition howsoever the necessity or desirability therefor may occur, and whether or not necessitated by wear, tear, absolence or defects, latent or otherwise.... As used herein, the term "repairs" shall include all necessary replacements, renewals, alterations and additions ...

Moreover, WVM and MM (the Tenants in terms of these agreements) agreed to make "necessary replacements" at their expense. We now find that leaking roofs and inadequate sewage capacity must necessarily be replaced or altered in areas to which the general public is invited. We find, too, that WVM and MM have no viable counterclaim for recoupment or set-off against the sums we have found First Union is owed pursuant to section 3.02(b).

### E.

Defendants have raised several other arguments which this Court finds highly imaginative but utterly unpersuasive. We conclude that, in consideration of the wording of the pertinent sections of the agreements between the parties and the testimony we heard on August 6 and 7, 1985 pertaining thereto, First Union warrants a verdict and judgment in this case. An Order consistent with that determination is attached hereto.

### ORDER

AND NOW, this 31st day of March, 1986, IT IS HEREBY ORDERED as follows:

1. Verdict is hereby entered on behalf of Plaintiff First Union.

2. Said Verdict is in the aggregate amount of:

(a) $172,582.97 (see paragraph 13 of Court's Findings of Fact); +

(b) $526,095.80 (see paragraph 14 of Court's Findings of Fact); +

(c) $56,397.27 (see paragraph 17 of Court's Findings of Fact); +

(d) $374,841.22 (see paragraph 18 of Court's Findings of Fact); +

(e) Whatever sums are due and owing under the formula expressed in paragraph 5 of this Court's Findings of Fact since Defendants stopped distributing money to First Union; +

(f) Legal interest running from July 28, 1983, the date on which the complaint in this lawsuit was filed.

3. Defendants are directed to remit to First Union not only the sums certain expressed above, but also the as yet indeterminate amount owed pursuant to subsection (e) of the preceding paragraph.

4. The parties are advised that this Court stands ready to make determinations consistent with the rationale of the accompanying Memorandum as to the aforementioned indeterminate amounts owed from the most recent lease years.

5. The Clerk is directed to enter judgment on this Verdict in favor of the Plaintiff.

6. The Clerk of Courts is directed to close this case.